Good morning, Your Honors. May it please the Court. Sarah Weinman, Federal Defenders of San Diego, on behalf of David Meza. This case is about Miranda, and it's about what constitutes an adequate Miranda advisal. And the question here is, if you listen to the advisal that Detective Brown gave, and you listen to it one time through, the way David Meza did, is that adequate? Is it effective and sufficient under Miranda? And does it meet Miranda's demand for clarity? And the answer is no, for several reasons. First of all, Brown began his advisal – Are we talking about the adequacy of the rights, or are we talking about a knowing and intelligent waiver? We've raised both arguments, Your Honor, and I'd like to focus now on the adequacy of the advisal. Well, that's why I wanted to make sure, because, as you know, if we're talking about the adequacy of the advisal, then I have de novo review. But if I'm talking about a knowing and intelligent waiver, then it's clear air, isn't it? Yes, it is, Your Honor. That's quite different. Correct. And if I'm looking at the adequacy of the rights, then I have Duxworth, which is right on point, saying, warnings need not be given in exact form described in the Miranda decision. No talismanic – I'm sorry, I might have got that wrong. I'm from Idaho. No talismanic incantation is required to satisfy its strictures. And then if I look at duty, then I say the inquiry is simply whether the warnings reasonably convey to a suspect his rights. That's all I've got to find here. Now, you're saying that didn't happen here? That's absolutely right, Your Honor. He did not reasonably convey the rights. It was in a casual tone. There was colloquial language. But how can one say that he didn't convey all the rights? For several reasons, Your Honor. First of all, at the outset of the advisal, Brown told Meza, I'm just going to read him his rights so that he understands them, so that after that, we can talk freely once I'm done with that. Saying we can talk freely as soon as I've read your rights, that's inconsistent with the right to silence. It's confusing, and it requires – Read the rights to him. Did he ask them if he understood them? Each time, did he not? He continually said, do you understand all that, including this talk freely comment at the outset. Regardless of how the audio sounds and what there is there, there's no problem that one can understand. He was asked every time, do you understand what I just said? Yes, Your Honor, and I would point this court to San Juan Cruz. In that case, this court found that the advisal was inadequate, and I went and looked at the government's brief in that case. And the government's brief in that case specifies that the defendant there said that he understood his rights and that he wanted to talk to Agent Clark. And I'm happy to give this court the site to that brief, but it's the August 9, 2002, answering brief in that case. So I think San Juan Cruz shows us that even when a defendant says that they understand all that or are cool with all that, that doesn't necessarily mean the advisal was adequate. And here, in addition to this talk freely comment, which I believe rendered the right to silence warning subject to equivocation. That's what San Juan Cruz says. If it makes it susceptible to equivocation, that is too confusing. But in addition to that, there's more. Well, I guess if I'm on de novo review, I'm wondering what difference if the defendant repeatedly states that he understands these rights each time. That's not what he said. He says he understands what Brown is saying. Well, now, that isn't exactly what he was asked. You don't understand what I'm saying was not the question. He says, do you understand all that? Are you cool with that? Do you understand what I've said? Not what I've said. Do you understand these rights? That's what he's saying. He didn't ask, do you understand these rights? He said, do you understand all that? And I would argue that the understand all that includes this talk freely. Well, he asked specific questions after each right. It wasn't at the end that you understand all this. He did ask periodically, yes, after each warning. So I would say I think the best analogy, Your Honors, is, you know, if you ask for directions to a restaurant and you get bad directions, you can very well say you understand those directions, but that doesn't mean you know where the restaurant is. Now, here, what we have is, you know, Brown was asking these questions. He's racing through the warnings. He has these long protracted fillers and pauses where he's humming and umming and drawing out these kind of long silence periods and then rushes through the delivery of the warnings themselves and says, are you okay with that? And Mays says, yes, yes, sir, and rushes to affirm. I don't think that answers the inquiry here. What we're looking at is, does this satisfy Miranda's demand for clarity? And is it confusing? That's what San Juan Cruz asks. Other than the beginning statement, we can talk freely after he gets his electricity problems down here. The poor presiding judge has got electronics going off under his legs. So other than that opening statement, what else do you think undermined the clarity of the warnings? So I would say I would point this court to several things. First of all, we have the advisal took 44 seconds. Twenty seconds of that is giving the warnings. The rest of the time, we have these like long pauses. So the warnings come across as kind of this afterthought. And if you look at the rates, the rate of speech that Brown had, he's talking up to 380 words a minute. Yeah, I saw that in your brief, and I hadn't yet listened to the tape. So I thought this was going to be like one of those auctioneers where you can't even understand what the person is saying. And that is not what I heard on the tape. I heard – I could hear with one exception every single word the person said. So why does the speed with which he gave the warnings matter? Because that one exception, if I am following Your Honor correctly, is in the right to counsel warning, one of the – obviously they're all fundamental, but that right to counsel warning, as Miranda says, is one of the most fundamental and important – and one of the areas that – Put that aside. I'm sorry. Sure. I just – what is it about the speed with which the person is speaking? As long as you can understand the words that they're articulating, why does that matter for Miranda purposes? Yes, Your Honor. The reason it matters is because what needs to happen here is that the Miranda warnings have to be conveyed in a way that conveys their importance. And I think when you rush the warnings like that, when you race through them, when you talk about them as an afterthought, oh, oh, oh, and by the way, then what you're doing is you're downplaying, you're minimizing, and you're trivializing the import of Miranda. And that's what the case law says you cannot do. That's what duty says you can't do. So the speed with which the warnings were given, you think, sort of conveyed that, don't worry about this, this isn't important? I think the speed did two things, Your Honor. One, it reduced the likelihood of comprehension. Two, it conveyed that these were just minimized, trivial rights, a formality to be gotten through. And that's what Miranda says you can't do. You can't have this. How long should it have taken? How long do you consider too fast? I did an experiment with my law clerks where I read each warning as they were given in this case. At my normal rate of speed, and my law clerk said that took 46 seconds. Miranda warnings are not very long. I wasn't humming during any of the breaks, which would increase the length, and the fact that it did, but I don't remember now how much longer. But what do you consider the speed limit? Well, I think so. Forty-six seconds is more than twice as long as it took Brown to give the warnings here. He took 20 seconds to give them. I think that's too short. Now, where we draw the line between 20 seconds and 46 seconds, I don't know that you necessarily need to define, but I think what we can say looking at this and listening to it, as Your Honors have done, is say that in combination, this talk freely comment, the rate of speech, the difference between the delivery, the speed at which he delivered the warnings compared to these long pauses and gaps in between, and coupled with, and I haven't mentioned this, the fact that Brown never asked the fifth warning. He never told the fifth warning. He never told Mesa that he could invoke at any time, nor did he ask him to waive. And I think if you look at the totality of the circumstances here, that's insufficiently clear, and it minimizes the ---- prior to questioning and have an attorney present during questioning, right? Yes, he did. I think that's the one that he said at about 375 words a minute. He said that. Well, he's going to talk faster than an Idaho guy because, I mean, I was listening, and I know I can't say it that fast, but I'm just trying to put things in perspective. Well, let's change then to the second. Your client had no mental problem. There wasn't any writing here, that's for sure. Not in Spanish, but said he was comfortably speaking in English. Spoke for four hours in English. Not a newcomer to the system. He asked him every time, Do you understand? I'm trying to figure out, do I owe any deference to the district court there? So I just want to be clear, are you asking about the waiver? I'm asking about whether there was a comprehension. I mean, I'm giving, as I started out with my questioning, I'm saying this is where I have to give some deference to the district court as to whether he understood or not. And it seems to me those questions are pretty well combined in this particular instance. Now, you want to divide them, and I appreciate you do. That's good for your argument. But now we're looking at did he understand, and now I owe deference to the district court. And then I gave you the reasons why I would think that there's nothing in here that would say the district court was wrong, that they abused their discretion, that they were clearly erroneous in saying your client knew. I appreciate your Honor's question because I wanted to address the district court's factual findings here. The district court made one factual finding here. That's at ER 147. It's in a footnote where the court says that it rejects Mesa's contention that Brown mumbled and swallowed his words. So, first of all, to the extent that that's a factual finding, I think it's contradicted by the record, if you look at the rate of speech, which the district court never calculated. And so that is clearly erroneous. I don't think that's a de novo review, but that is a deferential review. With regard to the factual finding, I think this court can find that clearly erroneous. So if I hear the recording and I think the district court was right, or I don't think there's anything that's abusive or clearly erroneous in what he did, then he didn't swallow or mumble. Well, I think, and again, I appreciate the court's question because even, let's accept the fact, this finding that he didn't mumble or swallow his words. You know, at the end of the day, what we're looking at here is the legal conclusion. Was this adequate? And I think, you know, Brown. So you're back to the first question. Right. Because if you're talking about the legal conclusion of whether the rights were effectively given, that's the question where it's de novo. And now I went then to the second part. And that's why I put all this stuff on there that made me think there's nothing to suggest the district court was clearly erroneous in its finding. So the district court, with respect to the waiver, said that Mesa explicitly waived. That's clearly erroneous. The government doesn't even argue to the contrary. Mesa never explicitly waived his rights orally. He never explicitly waived his rights in writing. With regard to the implicit waiver, yes, the district court clearly erred in finding there was an implied waiver here. Why? Because there was no course of conduct that shows that Mesa knowingly and intelligently waived his rights. And I think we can see. Did he have any mental problem before going in? No. Did he require it be in Spanish? No. He said it could be in English. He spoke for four hours in English. It was explained thoroughly. Do you understand? He's not a newcomer to the system. Why do I say, then, that I shouldn't give deference to what the district court found? Your Honor, the reason why is because while some of those facts that you just pointed to are facts that are discussed and considered in the case law, there's a couple others that are as well, and I think those are critically important here. If you look at North Carolina v. Butler, if you look at Briggs v. Tompkins, if you look at the circuit court cases that the government cites. It doesn't do me any good to cite any cases. What's the thing? What's the concept you're trying to get to? The thing is that all of the defendants in those cases were shown the Miranda form, were asked to either read the forms back. Oh, the reading. So the writing. Is that all you're after? Yes. Because that's what I thought you were after. It's got to be in writing every time in order to be comprehensible? It doesn't. I think in this case. Because there's no law saying it has to be in writing every time. That's right, Your Honor, because I think you have to look at the totality of the circumstances. And again, here, I think if you look at the way the adviser was given, plus the fact that he wasn't asked to read along, plus the fact that he wasn't asked to initial, plus the fact that he was never given the fifth warning, plus the fact that he was never asked to waive, plus the fact that unlike all of the suspects in all of the cases the government cites, Mazza wasn't asked to read along or to look at the form, then there is no course of conduct here, as Tompkins requires, showing an implied waiver. I have two questions. First, your client submitted an affidavit, but he didn't testify at the suppression hearing. He didn't say that he didn't understand the warnings. All he said was that he understood that Brown had to say those things before he started asking me questions, which is essentially legally correct. But what struck me was that he didn't say that he didn't understand them and that he didn't knowingly waive them. What he declared was that he understood that Brown had to read these things. And I think if you look at what happened here, where Brown is saying, I need to read you this stuff so that we can talk freely, and then Mazza starts talking freely afterwards, that's not an implied waiver that's knowing and intelligent in the way the law requires. My second question may require a longer answer. I think this error, if ever there was, is harmless. I think that there is absolutely no question beyond a reasonable doubt that he committed this murder, your client. And I don't even think you contest that. You focus in on the fact that when your client crossed the border to go from San Diego to Mexico, he had not formed the intent. If I'm not accurately describing your reply brief, you'll tell me. But that he had not actually formed the intent to kill. And I think that the evidence overwhelmingly suggests that he must have, if you accept the fact that he actually committed the murder, then the manner in which he went about doing it, spending time with the victim in Mexico, going back at 10.30 to San Diego, coming back at 12.30, middle of the night, back to the city in Mexico, calling your client to a place where they met in a fairly deserted area, and where your client's body was found nearby, thrown down, I don't know whether you would call it a hill, but thrown down a hill. And GPS records would show him in the area at that very time. And the benefits that he got as a result of committing the murder. He was a beneficiary of a $3 million will. I think he was the beneficiary of a condo that was worth, I don't know, hundreds of thousands of dollars. I don't remember that exactly. And interestingly enough, you rely on the questioning for some of your arguments in Harmless Error. For example, you rely on a question that the police officer asked, which said, did something go wrong? You rely on it for your later argument to suggest that maybe this was a crime of passion. And in the summation, the defense lawyer relied on part of that confession to suggest that he made this trip. And by the way, after the murder, he goes back that same night to California, changes his clothes before he does. But that he made this trip, he wanted the key to the victim's car so he could go steal his stereo equipment, which comes right out of the confession. I hate calling it a confession, because it would be more accurate as opposed to the rest statements, as he never actually confesses to the murder. I don't see that, I don't see how this is not harmless beyond a reasonable doubt. I would like to take time to respond, because I think this is, obviously this is very important. I know I'm over time, but with all due respect, Your Honor, the question here isn't was there sufficient evidence to convict without the statement. I didn't say that. The question is, the question here is, did the jury's guilty verdict, can we say that it is surely unattributable to the statements? Did the statements have some influence on the jury? And there is no question here, it is beyond any reasonable doubt that they did. The jury, after deliberating for a full week, asked to hear the entire two and a half hours of statements all over again during their deliberations. They rendered a verdict on count one the following day. Now, that's during deliberations. In addition to that, we have the way that the government emphasized. But it's not unusual. Juries are very careful, and at least that's my experience, and this is a murder case, and they know what the consequence of a guilty verdict is. And asking for his confession, in my view, can easily be construed as the jury wanting to hear his side of the story, which, and as I said, it was relied on by defense counsel in his summation. So the jury just wants to be sure, in my view, that at least that's how it can be read, about what it was doing before it finally convicted. I don't want to call it a confession because he didn't say he committed the murder. But the post-arrest statement essentially was his, it's all the jury had to know what his side of the story was. And so I think that's a very important point that we've wanted to hear it all over again. Even giving the jury the benefit of the doubt on that point, Your Honor, we know from Fulminante that a confession is special. A confession is especially probative and damaging, and that is true even more so, and this court has to exercise extreme caution, when the statements disclose the motive for and the means of the crime. And that's the way the government used the statements in this case to talk about the motive for the crime. Over and over again in their closing arguments, in their case in chief, they rely on the statements to show his motive was free. First of all, there was overwhelming evidence of that. And second, this is not, I think one has to draw, although Miranda excludes exculpatory statements and confessions. In terms of harmless error, there is a difference between saying that I did it and giving a statement that's exculpatory, in terms of weighing the harmlessness of the error. Yes, but here, what the government did, what these statements showed, is that Meza lied repeatedly. And he didn't just, this isn't lying to his dad about being gay or lying to his girlfriend or, you know, saying he's in nursing school and he's not. He's lying to a law enforcement officer for four hours. But he was lying to everybody about material aspects of this case, including saying that the person he killed was sick and maybe dying. He, there was an obstruction of justice in effect count based on the fact that he tried to do a false alibi. He was, his whole relationship with the victim was a lie. And the government brought that point out and it hammered that point home with the statements. And it did that over and over again. No, but the evidence was overwhelming. I mean, he sent the victim notes saying he was in love with him. How would we know that he wasn't in love with him if Meza didn't tell Brown I wasn't in love with him? I'm sorry, he wrote notes. He wrote on the receipt for the, when I believe he got the scooter from the victim on the invoice, he said, I love you. And then he wrote him a note, a belated birthday note, which was, which spoke about how sorry he was and how much he loved him. That was all false. He wasn't in love with him. He was in love with the, with what he was getting from him. And we know that from the statements and that was the government's narrative at trial. And that is why they played these statements over and over and kept Brown on the stand to say, as they asked Brown on the stand that he had already lied. And they enumerated the number of times he lied. He lied three times. He lied four times. In closing arguments, this is the sixth denial. He lied to everybody about material aspects of the case in ways that made whatever, whatever false statements he made to the detective, to my mind, just totally harmless. I think, Your Honor, if I could just say one last point here is that there is this kind of sporadic evidence. And the government used the statements to tie it all together. The statements were the web that brought this evidence together. It changed the evidentiary picture. It corroborated and it explained the other evidence. And you can see if you read the government's closing, for example, at 1745 in the excerpt of record, the government points to other evidence. And then he says, the prosecutor says, let's see why he did that. Let's see why he did that. And he says, what's the defendant's motive in this case? And he proves that by playing these statements. And he plays the statements 23 times in closing arguments. He plays those statements over and over to explain and flesh out. You don't need a statement to know what his motive was. I mean, the evidence is just overwhelming. The problem with prosecutors is that they don't, they have to, you know, I like to call it, they have the kitchen sink approach. They have to introduce everything and they have to say everything and they don't use any judgment. But the basic fact is, is that that was all proven by independent evidence. And he could have made a summation that was almost identical without any reference to the post-arrest statement. I respectfully disagree, Your Honor. And I think the jury's request to hear these statements over again shows that. Thank you, counsel. We'll give you some time. Thanks. Let's hear from the government. May it please the court. Daniel Zip on behalf of the United States, Your Honor. And Williams, the court made clear that there is a difference between full confessions and statements that are only inculpatory when combined with other evidence. As Your Honor noted, the confession in this case was not actually a confession. The defendant at no point during this four hour interview admitted to killing Mr. Marandino. In fact, he continually shifted his story and eventually arrived on his account of going to steal stereo equipment that his defense attorney was then able to use as sort of a theme for their defense at trial. If you look at the evidentiary value that the United States got out of the post-arrest statement, it was essentially threefold. One, the fact that this defendant lied repeatedly to the officer over the course of the interview. Two, that he had talked to someone else about creating an alibi in Mexico. And three, that he called Mr. Marandino and lured him out of his hotel room at one o'clock in the morning. All three of those evidentiary points were exhaustively covered by other evidence independent of the post-arrest statement. As to the lies to the officer, as Your Honor noted, the defendant in this case lied to multiple people about that specific lie that he told to Detective Brown. He called the friends of Mr. Marandino immediately after he was killed, told one of them that on the night of the murder that he was back in San Diego to visit his sick sister. He then called the attorney two days after that, as she said, whimpering to her and said that he had left Mexico and gone back to San Diego because of a car accident. He lied to the hotel manager when he first arrived back in Mexico and said that he had gone back to San Diego that night and he didn't understand why the victim had gone out without him. He lied at the primary inspection when he came back in that night and said that he had been visiting his family members. And he even lied to his best friend, Sergio Marron, at a baby shower the day after the murder and told him that he hadn't spoken with Mr. Marandino in days and he didn't know where he was. So with all of that evidence in the record, the fact that he also lied when interviewed by Detective Brown did not materially affect the outcome of trial.  The fact that he admitted to calling Mr. Marandino and luring him out of the hotel was also duplicated by the GPS data and phone records that showed the location of the victim. So in light of all of that evidence, whatever additional benefit the United States received from this would not have changed the outcome of trial and would have been harmless beyond a reasonable doubt, even if there was a violation of Miranda in this case. As to the substance of the Miranda claim, this Court has made clear that there's no precise formulation for what is required to advise a suspect of his Miranda rights. No talismanic incantation. And the precise words or the nicety of the language used by the officer does not control what controls the substance of the warnings given. Yeah, but I've never, never heard an agent or an officer give the warnings in the way that you're, he's a detective, I guess. He is, yes. I mean, it's, it certainly raises suspicions as to why he conducted himself in the way that he did. I think the defense's theory as to why he spoke so quickly and tried to downplay the significance of the warning seems spot on. And I guess I'm troubled by the notion that we're going to give our stamp of approval to the way this agent or an officer conducts himself. I don't think we're asking the agent to administer the warnings. This is certainly not the way we want any agent or any law enforcement officer to, to give someone Miranda warnings, is it? No, Your Honor, and I don't think we're asking you to give the stamp of approval to this manner of questioning. Certainly he could have done a better job and could have used an actual formal waiver form and done this in a different manner. But I think ultimately the legal question as to whether his voluntary statement should have been suppressed goes down to just the fact that he's a detective. And I think there's just essentially two questions. Was the substance of what he said to Mr. Meza sufficient? And then secondly, whether on a clear air standard, whether Mr. Meza actually knowingly and voluntarily waived his rights. However Your Honors feel about the manner that the, the way that the detective read these rights, if you look at what he actually said, the first three track exactly the language from the Miranda decision. The second one was in a more informal and casual tone, but it certainly expressed the fundamental idea that anything I can go ahead and use later on in court proceedings against you if I need to. The Supreme Court has held in Duckworth and Florida versus Powell on California v. Prysac that sort of courts need not parse the language of these Miranda warnings like they're construing a will or determining the scope of an easement. The question is whether that statement, even if it was colloquial, was sufficient to inform him of the rights. And I think if you look at what was actually said, the court got it right when it had denied his suppression motion and found that that was sufficient. Do I owe any deference to the district court's finding that the detective did not swallow or mumble the warnings and effectively conveyed the rights? Yes, Your Honor. Is that a factual finding? Yes, Your Honor. That's my question. Yes, I believe that is. I think it might be that he didn't swallow or mumble the warnings, but effectively conveyed the rights. Is that also factual? I think in the context of the overall finding that this was a knowing and voluntary waiver, all of that is subject to clear error review. As the Supreme Court held in Anderson v. Bessemer County, even when the court is reviewing documentary evidence or hard evidence that's separate from what actually occurred in the courtroom, the clear error standard still plays an important role in that it sort of gives a definitive answer at the trial stage. As the court held in Anderson, the trial should be the main event and not a tryout for the road. In other words, the parties can rely on this court's finding that this was a knowing and voluntary waiver, use that finding, shape their trial around it, put the evidence in, and know that there is going to be a deference owed to the district court's finding. And it's not going to be essentially a jump ball again when it comes back up on appeal. So I think certainly on that footnote and on the broader finding of knowing and voluntary, this court should apply clear error. And affirm as long as that knowing and voluntary finding is at least plausible in light of the record as a whole. What do our cases say about circumstances, the circumstances we have here where the agent does not ask the person, are you, now that I've explained these rights to you, do you wish to waive them? So we don't have an explicit waiver. That's quite clear, it seems to me. Yes. What do our cases say about when and under what circumstances an implicit waiver is permissibly sort of inferred from what happens? Sure, Your Honor. I think the case is younger, and this court explicitly held that there doesn't need to be an explicit waiver at the end of the advisals. That was sort of the original, and then there's a couple cases afterwards, Cruz and Garibay, where the court established five or six factors that the court should consider when determining whether a waiver was knowing and voluntary. In this case, most of those factors, other than the lack of a written waiver, weighed in favor of the court's decision. The court's ultimate finding in this case that it was knowing and voluntary. As Your Honor noted, the defendant had no mental issues. He was a high school graduate who clearly had the mental capabilities to maintain this dual life and orchestrate this murder. There was no issues with the language involved. He indicated that he understood the rights. In fact, every time the detective read him his rights, he immediately followed up with, do you understand all that? And the defendant responded either yes, mm-hmm, or yes, sir. So the record is clear that he actually understood the rights. And as Your Honor noted, the final point is that he was experienced with the criminal justice system. He had been tried and convicted of prostitution just a few years before. He had also recently been charged and pled guilty to a battery on his fiancée. So that, in combination with the affirmative statements to the detective that he understood, certainly was plausible for the district court to conclude that his waiver was knowing and voluntary. And then the final argument is that the initial statement by the officer that it was knowing and voluntary. Essentially that we can talk freely afterwards. This was nothing like the sort of direct contradictory advisals that this court has found problematic in San Juan Cruz, for instance. Cases where an agent read from a sort of civil immigration set of rights, specifically informed the defendant, your right is to have an attorney, but you have to pay for it yourself. And then immediately changed over and read a different right from Miranda without any explanation. Here the detective was sort of speaking in the third person at the outset when he turned the recorder on. And it's not clear that that we can talk freely afterwards. It's certainly plausible for the court to conclude that that would not eviscerate the other clear express statements of rights that immediately followed. So I have some time on the clock, but I'm happy to answer any questions that the court has about this or any other issues. Okay. Thank you, counsel. Thank you. Let's put two minutes on the clock for rebuttal. A couple of quick points, first on the advisal and second on harmlessness. San Juan Cruz says that if it's confusing, it's inadequate. If it requires a defendant to sort out the confusion, it places an undue burden on the suspect. And that's what happened here with respect to the talk freely. It's at a minimum, it makes the warning that anything can be used against you susceptible to equivocation. And as Your Honor pointed out, coupled with that, we have this overall doubt that the defendant is not being heard. And I think this is not what we want to tell law enforcement officers all over the country is okay. This is not adequate. With regard to harmlessness, again, I would urge the court to look again at the passage of Fulminante 296, where the Supreme Court points out that a confession is like no other evidence. It is simply more probative and more damaging to a defendant, his own statements are, than any other evidence. It's not like any other kind of piecemeal evidence the prosecution may point to. And here, not only did the prosecution use the lies that Mesa told the detective over the course of these four hours. The prosecution used that to say that lying is tantamount to guilt. It's tantamount to a full confession. He continued to say over and over, three times, four times, five times the prosecution spells out for the jury, he wasn't there that night. Only eventually to admit that that was a lie. And the government argued in closing argument at 1771 and 1772, this middle of the night crossing. As you recall from the tape recorder interview of Detective Brown, this is the big one. He wanted to hide the fact that he was in Mexico, crossing number two. And saying he wanted to hide that, that's essentially saying that he's guilty. So it's at least a next step to a full confession. And with regard to that, there was also a full confession with regard to the obstruction of justice count. And Fulminante tells us that where there's a full confession, this court should almost never hold that it's harmless beyond any reasonable doubt to erroneously admit statements. Okay, thank you very much, Counsel.
judges: N.R. Smith, Watford, Korman